# In the United States Court of Federal Claims

BID PROTEST
No. 12-274 C
(Filed Under Seal: July 30, 2012)
(Reissued for Publication:  August 10, 2012)[*]
TO BE PUBLISHED

| | |
|---|---|
| DISTRIBUTED SOLUTIONS, INC., <br><br> Plaintiff, <br><br> v. <br><br> THE UNITED STATES, <br><br> Defendant, <br><br> and <br><br> COMPUSEARCH SOFTWARE SYSTEMS, INC., <br><br> Defendant-Intervenor. | Department of Labor RFQ to procure Acquisition Management System; use of GSA Federal Supply Schedule to acquire IT system; FAR Part 8; FAR Part 15 inapplicable; DOL seeking a commercial-off-the-shelf ("COTS") solution; plaintiff's pre-award and post-award protests at GAO; DOL's corrective action; reevaluation of proposals; live product demonstration; past performance evaluation; price reasonableness analysis; DOL's calculation of Independent Government Cost Estimate ("IGCE"); tradeoff analysis was reasonable and adequately documented; IT Dashboard; DOL complied with duty to evaluate bids fairly and honestly. |

Thomas A. Coulter, Nicole Hardin Brakstad, LeClairRyan, Richmond, Va., for plaintiff.

Daniel G. Kim, Trial Attorney, Kenneth M. Dintzer, Assistant Director, Jeanne E. Davidson, Director, Commercial Litigation Branch, Stuart F. Delery, Acting Assistant Attorney General, Civil Division, United States Department of Justice, Washington, D.C., for defendant. David R. Koeppel, Dennis Adelson, Colin W. O'Sullivan, Office of the Solicitor, United States Department of Labor, Washington, D.C., of counsel.

David S. Cohen, Cohen Mohr, LLP, Washington, D.C., for defendant-intervenor.  John J. O'Brien, Gabriel E. Kennon, Cohen Mohr, LLP, Washington, D.C., of counsel.

---

[*] This Opinion and Order was filed under seal on July 30, 2012 (docket entry 65) pursuant to the protective order entered on May 4, 2012 (docket entry 17).  The parties were given an opportunity to advise the Court of their views with respect to what information, if any, should be redacted prior to publication.  The parties filed a joint status report on August 9, 2012 (docket entry 67) in which they proposed certain redactions and explained their reasons therefor.  The Court has reviewed those proposed redactions and concluded that they should be accepted. Accordingly, the Court is reissuing for publication its Opinion and Order dated July 30, 2012 with redactions indicated by three consecutive asterisks within brackets ([***]).

## OPINION AND ORDER

<u>GEORGE W. MILLER</u>, Judge

On May 1, 2012, plaintiff, Distributed Solutions, Inc. ("DSI"), filed a complaint in this Court (docket entry 1), which was subsequently amended on May 22, 2012 (docket entry 24), alleging that the Department of Labor ("DOL") acted arbitrarily, capriciously, and not in accordance with law, and abused its discretion when it awarded a contract for an Acquisition Management System ("AMS")[1] to defendant-intervenor, Compusearch Software Systems, Inc. ("Compusearch"). Thereafter, the parties filed cross-motions for judgment on the administrative record (docket entry 22, May 22, 2012; docket entry 23, May 22, 2012; docket entry 26, May 23, 2012;[2] docket entry 33, June 7, 2012; docket entry 35, June 7, 2012) as well as corresponding responses and replies (docket entry 45, June 18, 2012; docket entry 47, June 25, 2012; docket entry 50, June 25, 2012). On July 10, 2012, following oral argument, *see* Transcript of July 10, 2012 Hearing, *Distributed Solutions, Inc. v. United States*, No. 12-274 C (Fed. Cl. July 17, 2012) (hereinafter "Hr'g Tr."), the Court issued a bench ruling **GRANTING** defendant's and defendant-intervenor's motions for judgment on the administrative record and **DENYING** plaintiff's motion for judgment on the administrative record. The Court stated that a written opinion would follow.

## I.      Background

### A.      Procurement History and Original Request for Quotes

On November 23, 2009, DOL issued a Request for Information ("RFI") to conduct market research for E-Procurement Capabilities. Administrative R. ("AR") Tab 25. On January 4, 2010, plaintiff responded to the RFI, *see* AR Tab 26, at 544–78, and simultaneously notified DOL that it believed the RFI was biased because it used language adopted from defendant-intervenor's website describing its acquisition software and, therefore, DOL's market research would be flawed, AR Tab 26, at 542–43. DOL replied assuring plaintiff that its market research was appropriate. AR Tab 27, at 581.

In May 2010, DOL issued its Market Research Report. AR Tab 90. The report explained that DOL received nine responses to its RFI and that there were three feasible alternative solutions proposed: (1) cheapest to implement (plaintiff), (2) mainstream (defendant-intervenor),

---

[1] "Generally, an acquisition management system would be used by the agency to order material and supplies." *Distributed Solutions, Inc. v. United States*, No. 06-466 C, 2012 WL 1570997, at *1 n.2 (Fed. Cl. Apr. 13, 2012).

[2] Plaintiff submitted an amended memorandum in support of its motion for judgment on the administrative record that provided proper page numbers. The Court cites to this document throughout its opinion.

and (3) Oracle Advance Procurement Suite with a Contract System ([***]).  AR Tab 90, at 2290. The report noted that plaintiff's solution met 96.6% of DOL's requirements and would be the least expensive to implement, that defendant-intervenor's so-called mainstream solution met 97.6% of DOL's requirements, and that [***] solution met 98% of DOL's requirements.  *Id.* When discussing pros and cons, the report explained that plaintiff's solution had "no established 'community of users' (federal users group) outside of DOL" and that the PRISM solution proposed by both defendant-intervenor and [***] had "a very active community of users group [and was] used by 75 federal organizations across the civilian, defense, intelligence and public sectors."  *Id.*  Of the three solutions, DOL found that the two most viable alternatives were proposed by defendant-intervenor and plaintiff.  *Id*.

On June 25, 2010, DOL finalized its Acquisition Plan and accompanying Independent Government Cost Estimate ("IGCE").  *See* AR Tab 18; AR Tab 19, at 395.  The Acquisition Plan concluded "that a [General Services Administration ('GSA')] competition would be the most advantageous procurement strategy to obtain the best value for the Government."  AR Tab 18, at 390.

On July 16, 2010, DOL issued RFQ No. DOL110RQ21021, seeking a firm-fixed price task order contract issued under the GSA Federal Supply Schedule ("FSS") Information Technology Schedule 70 for "commercial-off-the-shelf" ("COTS") acquisition software.  AR Tab 34, at 603–04, 627; *see also* AR Tab 1.  The original Request for Quotes ("RFQ") called for a performance period of a one-year base period, plus four one-year option periods, AR Tab 34, at 628, which was later amended to include six one-year option periods, AR Tab 93, at 2422 (amendment eight).  Quotes were limited to GSA schedule holders with applicable Special Item Numbers ("SINs").  AR Tab 34, at 604.  On July 29, 2010, in an answer to a quoter's question, DOL indicated it was seeking a government-off-the-shelf ("GOTS") solution.  AR Tab 2, at 82; *compare* AR Tab 1 (amended solicitation with COTS references), *with* AR Tab 34 (original solicitation containing several GOTS references).

### B.        *Bid Protest History, RFQ Amendments, and Corrective Action*

Plaintiff filed a pre-award protest at the Government Accountability Office ("GAO") on August 13, 2010.  AR Tab 24.  Plaintiff protested, among other things, DOL's use of the FSS to procure a GOTS system.  AR Tab 24, at 478–80.  At the request of the GAO, GSA issued comments on the solicitation stating that it could not determine whether the product DOL sought fell within FSS Schedule 70 and that, in general, GOTS systems cannot be acquired through FSS Schedule 70.  AR Tab 41, at 718–20.  In response to the protest and GSA's comments, DOL informed GAO that it would not seek a GOTS solution and that it would not issue an award under the solicitation as it was then written.  AR Tab 44, at 724.  As a result, on October 29, 2012, GAO dismissed plaintiff's protest as academic.  AR Tab 46, at 227–28.

On December 9, 2010, DOL issued an amended RFQ, RFQ No. DOL110RQ21021-01, utilizing the same FAR Part 8 procurement strategy.  AR Tab 1.  DOL removed all references to a GOTS system and instead made clear that DOL was pursuing a COTS system.  *See id.*

The RFQ provided that quotes would be evaluated based on technical approach, past performance, product demonstration, and price.  AR Tab 1, at 72.  Technical approach was

"significantly more important than Past Performance and when combined, these two factors [were] more important than Price." *Id.* The price factor became "significantly more important as non-price factors approach[ed] equality." *Id.* The live product demonstration factor was equal in importance to past performance. *Id.*

The RFQ stated that technical proposals were to be rated using an adjectival scale ranging from "unsatisfactory" to "excellent." AR Tab 1, at 69–70. Within the technical factor, subfactor (a), functionality requirements, and subfactor (b), technical approach, were of equal importance. AR Tab 1, at 69, 72. The RFQ instructed that the technical quotes "shall address the requirements of the RFQ and the evaluation factors presented in [the] RFQ in a straightforward, complete and concise manner." AR Tab 1, at 69. Additionally, quoters were required to "demonstrate [their] ability to comply with each requirement and explain how such compliance is achieved." *Id.* Quotes that paraphrased or regurgitated requirements were considered "inadequate and [would] be deemed not to comply with the RFQ." *Id.*

With regard to subfactor (a) of the technical factor, the RFQ required quoters to "provide comment(s) for Attachments 2–4 on how their proposed product meets that specific functionality." *Id.* "No comment, commenting as 'N/A', or leaving this field blank [would] count against the overall total score." *Id.* The RFQ went on to explain: "It is very important that all quoters make it clear how and when they intend to meet each functional requirement. Solutions that fail to meet any of the High Priority functional requirements will not be considered."[3] *Id.*

Pursuant to the RFQ, subfactor (b) of the technical factor contained the following ten components, for which each quote was evaluated: (1) Understanding of the Management and Implementation Requirements (based on data migration and conversion requirements), (2) DOL System Interface Requirements, (3) DOL IT Security System Requirements, (4) Project Management and System Development Life Cycle Methodology ("SDLCM") Implementation Plan and Approach, (5) Quality of Key Personnel, (6) Training, (7) Operations and Maintenance, (8) Help Desk Support, (9) Quality Control Plan, and (10) Quality Assurance Surveillance Plan.[4] *Id.*

For the past performance factor, quoters were to provide at least three past performance references that were directly related to the RFQ requirements, including "implementation, operations and maintenance, training, and help desk support in a Federal agency in the past five years." AR Tab 1, at 70. Additionally, the RFQ provided that "DOL [could] check other sources of past performance information." *Id.* The past performance information was "combined to assess the risk of the Quoter to successfully perform the requirements of [the] RFQ." *Id.*

---

[3] The original paragraph explaining subfactor (a) was subsequently altered by amendment six to the RFQ. *See* AR Tab 7, at 90.

[4] The solicitation set forth various requirements for each component identified within subfactor (b). *See* AR Tab 1, at 32–55.

After all technical and past performance evaluations were complete, "a competitive range consisting of the most highly rated Quotes [could] be further evaluated" based on a live product demonstration.  AR Tab 1, at 72.  For the live product demonstration, quoters were required to "conduct two separate user sessions with DOL staff following the script provided."  AR Tab 1, at 71.  Each of the two sessions, "one for the procurement request functions and one for the solicitation/contracting functions," was to be attended by up to five DOL staff members who would "evaluate the product's User Interface, Reports, Wizards/Help Tips, etc."  *Id*.  Quoters were to send "key personnel to conduct these sessions and provide specific guidance on moving the users through [the] procurement software."  *Id*.

The RFQ further stated that DOL "intend[ed] to evaluate quotes and make award without discussions," and, therefore, the "initial quote should contain the Quoter's best terms from a price and technical standpoint."  AR Tab 1, at 72.  DOL "reserve[d] the right to conduct discussions, if necessary," and could "reject any or all quotes if such action is in the public interest, accept other than the lowest quote, and waive informalities and minor irregularities in Quotes received."  *Id*.  The RFQ expressly stated that DOL was "more concerned with obtaining superior technical features than with making an award at the lowest overall price to the Government," but would "not make an award at a significantly higher overall price to the Government to achieve slightly superior technical features."  *Id*.

On December 29, 2010, plaintiff wrote DOL objecting to portions of the amended RFQ and requesting that DOL take corrective action.  AR Tab 47.  Plaintiff asserted, among other things, that the changes to the RFQ were "[u]nduly restricting vendors from providing the most affordable solutions to the DOL."  AR Tab 47, at 729.  In response, DOL treated plaintiff's letter as an agency-level protest and stated it would amend the RFQ.[5]  AR Tab 48, at 732–33; *see* AR Tab 8 (amendment seven); *see also* AR Tab 52, at 773–74 (explaining that DOL issued amendment seven in response to plaintiff's December 29, 2010 protest).  Plaintiff filed a second

---

[5] Prior to the January 27, 2011 amendment (amendment seven), AR Tab 8, DOL had twice amended the December 9, 2010 RFQ, *see* AR Tab 22, at 456; *see also* AR Tab 6 (amendment five); AR Tab 7 (amendment six).  Amendment five, in part, removed the following paragraph from the "Basis for Award" section of the RFQ:

> Rejection of Unrealistic Quotes: The Government may but is not required to reject any quote that is evaluated to be unrealistic in terms of program commitments, including task order terms and conditions, or unrealistically high or low in prices when compared to Government estimates, such that the quote is deemed to reflect an inherent lack of competence or failure to comprehend the complexity and risks of the requirements.

AR Tab 6, at 89; *see* AR Tab 1, at 72.  Amendment six principally deleted the paragraph describing subfactor (a) and replaced it with a similar paragraph requiring that quoters provide template language in response to each identified requirement.  AR Tab 7, at 90.  In addition, the RFQ was later amended once more, as mentioned previously.  *See supra* Part I.A; AR Tab 93 (amendment eight).  Amendment eight modified, among other things, the solicitation's performance metrics and the performance period.  AR Tab 93.

pre-award protest at the GAO on January 18, 2011. *See* AR Tab 51. An agency report issued by DOL stated that amendment seven "rendered moot" several of plaintiff's protest grounds. AR Tab 52, at 774. Plaintiff filed a supplemental protest at the GAO on February 28, 2011, contending, in part, that DOL "failed to adequately plan for this acquisition or conduct it in compliance with the FAR or federal law." AR Tab 55, at 796. Plaintiff withdrew its protest and supplemental protest on April 26, 2011, AR Tab 67, at 1764, allegedly after receiving confirmation that its quote was deemed to be in the competitive range and would be fully considered for award, Pl.'s Mem. in Supp. of Mot. for J. on Administrative R. ("Pl.'s MJAR") 7.

After receiving initial proposals, DOL held discussions with each quoter. *See* AR Tab 22, at 457. On June 3, 2011, quoters submitted final proposal revisions. *See* AR Tab 10, at 98; AR Tab 21, at 404; *see also* AR Tab 12 (defendant-intervenor's revised price proposal); AR Tab 13 (plaintiff's revised price proposal). On August 11, 2011, the contracting officer ("CO") issued an Award Decision Document selecting defendant-intervenor as the awardee. AR Tab 16. Plaintiff filed a third GAO protest on August 26, 2011, its first post-award protest, alleging that DOL had failed to properly conduct the procurement. AR Tab 68. Plaintiff then filed a supplemental protest alleging that DOL evaluated quoters using unstated evaluation criteria and that DOL failed to properly amend the solicitation after changing its requirements. AR Tab 79. DOL subsequently acknowledged making errors in its evaluation and, on October 26, 2011, DOL notified GAO of its intent to take corrective action by conducting a reevaluation of the quoters' technical proposals. AR Tab 85, at 2255. As a result, the GAO dismissed plaintiff's third protest as academic. AR Tab 88, at 2263–64.

On March 27, 2012, following the completion of the corrective action, the CO issued a new Award Decision Document, reaffirming the award to defendant-intervenor. AR Tab 22. Plaintiff states that it filed a fourth protest on April 9, 2012 "seeking to remedy the remaining flaws in DOL's evaluation." Pl.'s MJAR 11.

   *C.     Evaluation, Reevaluation, and Present Action*

As noted, on June 3, 2011, DOL received final quotations from defendant-intervenor, plaintiff, and [***]. *See* AR Tab 10, at 98; AR Tab 21, at 404; *see also* AR Tabs 12–13. Plaintiff's total evaluated price was [***] and defendant-intervenor's total evaluated price was $19,877,878.63. *See* AR Tab 16, at 316. DOL evaluated each offeror's price in relation to the IGCE, which was [***]. *Id.* The IGCE was computed based on the existing rates DOL experienced with its current vendors and the responses DOL received to the RFI. AR Tab 18, at 389; *see* AR Tab 19, at 395–96. Defendant-intervenor's price quote was approximately [***] lower than the IGCE, and plaintiff's price quote was approximately [***] lower. AR Tab 22, at 467–68.

The technical quotations were evaluated by DOL's technical evaluation panel ("TEP") and assigned adjectival ratings. *See* AR Tab 10. The TEP rated defendant-intervenor as "very good" and plaintiff as "good" overall for the technical factor. AR Tab 10, at 145.

For the past performance factor, each quoter identified at least three references for similar work completed within the past five years. AR Tab 11, at 146. Each reference received and answered a questionnaire via e-mail. *Id.* Additionally, a DOL reference with "firsthand

knowledge of the procurement and implementation of DOL's E-Procurement System (EPS)" received a questionnaire.  *Id.*  DOL also searched through the Contractor Performance Assessment Reporting System for additional past performance information.  *Id.*  Overall, DOL considered fourteen questionnaires: four for plaintiff, five for defendant-intervenor, and five for [\*\*\*].  *Id.*  Defendant-intervenor received a "very good" past performance rating, and plaintiff received a "satisfactory" rating.  AR Tab 11, at 146–47.

After the competitive range was established, each remaining offeror conducted a live product demonstration of its proposed system.  AR Tab 1, at 71–72; *see* AR Tab 9 (summary of product demonstrations).  The demonstrations were attended by contracting personnel from several DOL agencies who "tested the systems for look, feel, logic, flow and robustness of reporting function."  AR Tab 81, at 2163; *see* AR Tab 1, at 71; AR Tab 16, at 316; *see also* AR Tab 9, at 95–97 (listing personnel who attended the product demonstrations).  A summary of the product demonstrations recorded that attendees found defendant-intervenor's system easy to use and plaintiff's system "very difficult to understand."  AR Tab 9, at 93.  Additionally, some users questioned whether plaintiff's system was Section 508 compliant.[6]  AR Tab 9, at 93–94.  Ultimately, defendant-intervenor received a rating of "very good" and plaintiff received a rating of "good" for the live product demonstration factor.  AR Tab 16, at 317.

Following DOL's decision to take corrective action on October 26, 2011, the TEP reevaluated the offerors' technical proposals under each of the factors set forth in the RFQ.  AR Tab 21, at 404.  The TEP was able to "reach[] a new consensus of ratings" for the quotes that it documented in its January 26, 2011 report.  AR Tab 21, at 405.  After the reevaluation of sub-factor (a) of the technical factor, defendant-intervenor and plaintiff each received the same ratings as the first evaluation for functional requirements, technical requirements, and integration requirements.  *Compare* AR Tab 10, at 144, *with* AR Tab 21, at 408; *see also* AR Tab 21, at 405.  The overall ratings for sub-factor (a) changed from a "very good/minimal risk" rating to an "excellent/very good" rating for defendant-intervenor, and from a "good/moderate risk" rating to a "good/marginal" rating for plaintiff.  *Compare* AR Tab 10, at 144, *with* AR Tab 21, at 408.  The TEP explained that defendant-intervenor had "a very good to excellent probability of satisfying the requirements with minimal risk to DOL" and that it did not have "a high degree of confidence that [plaintiff's] product 'really does what [plaintiff] says it does.'"  AR Tab 21, at 408.

Under sub-factor (b) of the original evaluation, defendant-intervenor received three "excellent," six "very good," and two "good" ratings for an overall rating of "very good/minimal risk."  AR Tab 10, at 144.  In the reevaluation, defendant-intervenor received six "excellent,"

---

[6] Section 508 of the Rehabilitation Act requires that federal departments and agencies ensure that their electronic and information technology is accessible to users with disabilities. 29 U.S.C. § 794d.  Section 508 compliance was mandatory under subfactor (a) of the technical factor of the solicitation.  The solicitation stated: "The Quote shall be evaluated as to what extent it meets each functional requirement of Attachments 2–4.  Requirements in attachments 2–4 identified as 'High' priority are mandatory . . . ."  AR Tab 1, at 69.  Attachment 3 to the solicitation, Technical Requirement, provided that Section 508 compliance was high priority.  *See* AR Tab 96, at 2514.

three "very good," and one "good" rating with an overall rating of "excellent/very good."  AR Tab 21, at 453–54.  Plaintiff received five "very good" and six "good" ratings, with an overall rating of "good/moderate risk" in the original evaluation.  AR Tab 10, at 144.  In the reevaluation, plaintiff received seven "very good" and three "good" ratings, with an overall rating of "very good/good."  AR Tab 21, at 453–54.  The subfactor (b) reevaluation removed two improperly included evaluation categories, "Change Management" and "Business Process Re-Engineering," and added an additional category, "Quality Assurance Surveillance Plan," pursuant to the solicitation and in accordance with the agency's corrective action.  *Compare* AR Tab 10, at 101–02, *with* AR Tab 21, at 453–54; *see* AR Tab 85, at 2255.

In her second award decision, the CO reviewed the TEP ratings and assigned her own overall technical ratings to each offeror, giving defendant-intervenor an overall technical rating of "excellent" and plaintiff an overall technical rating of "very good."  AR Tab 22, at 468–70.  The CO then engaged in a tradeoff analysis, evaluating price and non-price factors in relation to each other.  AR Tab 22, at 472–74.  The CO determined that defendant-intervenor "offer[ed] the significantly better quote/proposal from a non-price standpoint."  AR Tab 22, at 473.  The CO then concluded that defendant-intervenor, even at a higher price than plaintiff, presented the best overall value to the Government.  AR Tab 22, at 474.

On May 22, 2012, plaintiff filed an amended complaint alleging DOL "conducted an arbitrary and capricious procurement process, resulting in flawed evaluations of both plaintiff's and the awardee's quotes."  Am. Compl. 1.  Plaintiff alleges that errors in its initial evaluation went uncorrected and that there were errors in the corrective action.  *See id.*  Specifically, plaintiff alleges that (1) DOL improperly reevaluated plaintiff's and defendant-intervenor's technical approaches; (2) DOL failed to engage in meaningful discussions with plaintiff; (3) DOL misevaluated plaintiff's past performance; (4) DOL misevaluated plaintiff's product demonstration; (5) DOL misevaluated defendant-intervenor's technical approach; (6) DOL failed to engage in a proper price-reasonableness evaluation; (7) the IGCE was unreasonably high; (8) DOL's misevaluations of plaintiff's and defendant-intervenor's quotes caused a flawed cost/technical tradeoff analysis and resulted in a flawed best-value determination; (9) DOL acted arbitrarily and capriciously when it decided to pay more than a [***] price premium for a one-level rating improvement; (10) DOL breached the implied contract to fully and fairly consider plaintiff's proposal; (11) DOL failed to treat plaintiff impartially, fairly, and equitably; (12) DOL breached the implied duty of good faith and fair dealing; and (13) DOL failed to implement its proposed corrective action.  *See* Am. Compl. 35–59.

On May 1, 2012, the date the original complaint was filed, the Court held an initial status conference (docket entry 13), during which the Court granted defendant-intervenor's motion to intervene.  *See* May 2, 2012 Order 1 (docket entry 14).  The administrative record was filed on May 4, 2012 (docket entry 18), and amended on May 18, 2012 (docket entry 19).  As noted, on May 22, 2012, plaintiff filed its motion for judgment on the administrative record.  Defendant and defendant-intervenor filed their cross-motions for judgment on the administrative record and responses in opposition to plaintiff's motion for judgment on the administrative record on June 7, 2012.  Plaintiff filed its reply to defendant's and defendant-intervenor's responses to plaintiff's motion for judgment on the administrative record on June 18, 2012.  On June 25, 2012, defendant and defendant-intervenor filed their replies to plaintiff's response to their cross-motions for judgment on the administrative record.

## II.   Discussion

### A.   Jurisdiction

This Court has jurisdiction over post-award protests, such as this one, pursuant to the Tucker Act, 28 U.S.C. § 1491, as amended by the Administrative Dispute Resolution Act of 1996, Pub. L. No. 104-320, 110 Stat. 3870.  Specifically, 28 U.S.C. § 1491(b)(1) provides this court with the authority "to render judgment on an action by an interested party objecting to a solicitation by a Federal agency for bids or proposals for a proposed contract or to a proposed award or the award of a contract or any alleged violation of statute or regulation in connection with a procurement or a proposed procurement."  28 U.S.C. § 1491(b)(1).

Notably, the Federal Acquisition Streamlining Act's ("FASA") limitation on the protest of task or delivery orders in the Court of Federal Claims, 41 U.S.C. § 4106(f), does not extend to task orders issued pursuant to the GSA FSS.  *Furniture by Thurston v. United States*, 103 Fed. Cl. 505, 511 n.8 (2012) ("[T]his statutory constraint [of  FASA] does not apply to the court's jurisdiction over protests of task orders under GSA FSS contracts . . . ."); *Data Mgmt. Servs. Joint Venture v. United States*, 78 Fed. Cl. 366, 371 (2007) ("The court's protest jurisdiction extends to protests of task or delivery orders placed against a GSA schedule contract."); *Idea Int'l, Inc. v. United States*, 74 Fed. Cl. 129, 135–37 (2006) (discussing FASA and its relation to orders placed against the GSA FSS and concluding that "FASA's prohibition on bid protests does not cover GSA [FSS] orders"); *see also Data Mgmt. Servs. Joint Venture*, 78 Fed. Cl. at 371 n.4 (discussing the court's precedent on the applicability of FASA to GSA FSS task orders). Accordingly, this Court possesses subject matter jurisdiction over plaintiff's bid protest action.

### B.   Legal Standard

When deciding a case based on cross-motions for judgment of the administrative record pursuant to Rule 52.1 of the Rules of the Court of Federal Claims, the court "examines whether the administrative body, given all the disputed and undisputed facts appearing in the record, acted in a manner that complied with the legal standards governing the decision under review." *MORI Assocs., Inc. v. United States*, 102 Fed. Cl. 503, 518 (2011).  The court's "[f]actual findings are based on the evidence in the record, 'as if [the Court] were conducting a trial on the record.'"  *Id.* (quoting *Bannum Inc. v. United States*, 404 F.3d 1346, 1357 (Fed. Cir. 2005)) (second alteration in original); *accord Harper v. United States*, No. 11-45C, 2012 WL 1072308, at *6 (Fed. Cl. Apr. 2, 2012).

The Court of Federal Claims reviews an agency's procurement decisions pursuant to the Administrative Procedure Act.  *Banknote Corp. of Am., Inc. v. United States*, 365 F.3d 1345, 1350 (Fed. Cir. 2004).  "[A] reviewing court shall set aside the agency action if it is 'arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law.'"  *Id.* at 1350–51 (quoting *Advanced Data Concepts, Inc. v. United States*, 216 F.3d 1054, 1057–58 (Fed. Cir. 2000)).  "Under this standard, a procurement decision may be set aside if it lacked a rational basis or if the agency's decision-making involved a violation of regulation or procedure." *DynCorp Int'l LLC v. United States*, 76 Fed. Cl. 528, 536 (2007) (citing *Impresa Construzioni Geom. Domenico Garufi v. United States*, 238 F.3d 1324, 1332 (Fed. Cir. 2001)).

To determine if an agency's decision lacked a rational basis, the court must analyze "whether the contracting agency provided a coherent and reasonable explanation of its exercise of discretion." *MORI Assocs., Inc.*, 102 Fed. Cl. at 519 (quoting *Impresa Construzioni Geom. Domenico Garufi*, 238 F.3d at 1333) (internal quotation marks omitted).  This analysis involves assessing whether the agency "'failed to consider an important aspect of the problem, offered an explanation for its decision that runs counter to the evidence before the agency,' or made a decision that was 'so implausible that it could not be ascribed to a difference in view or the product of agency expertise.'" *Id.* (quoting *Ala. Aircraft Indus., Inc.-Birmingham v. United States*, 586 F.3d 1372, 1375 (Fed. Cir. 2009)).  With regard to a showing that an agency's action violated regulation or procedure, the "showing must be of a 'clear and prejudicial violation.'" *Id.* (quoting *Impresa Construzioni Geom. Domenico Garufi*, 238 F.3d at 1333).

The agency has broad discretion in conducting a procurement.  *See Lockheed Missiles & Space Co. v. Bentsen*, 4 F.3d 955, 958–59 (Fed. Cir. 1993) ("Effective contracting demands broad discretion.  Accordingly, agencies 'are entrusted with a good deal of discretion in determining which bid is the most advantageous to the Government.'" (citations omitted) (quoting *Tidewater Mgmt. Servs., Inc. v. United States*, 573 F.2d 65, 73 (Ct. Cl. 1978)) (citing *Burroughs Corp. v. United States*, 617 F.2d 590, 598 (Ct. Cl. 1980))); *DynCorp Int'l LLC*, 76 Fed. Cl. at 537 ("'[B]est value' contract awards give a contracting officer more discretion than awards based on price alone." (citing *Galen Med. Assocs., Inc. v. United States*, 369 F.3d 1324, 1330 (Fed. Cir. 2004))).  Specifically, in the context of a rational basis analysis, "courts have recognized that contracting officers are 'entitled to exercise discretion upon a broad range of issues confronting them' in the procurement process." *Impresa Construzioni Geom. Domenico Garufi*, 238 F.3d at 1332 (quoting *Latecoere Int'l, Inc. v. U.S. Dep't of Navy*, 19 F.3d 1342, 1356 (11th Cir. 1994)).  The court, thus, must afford agency decisions deference, and plaintiff bears the burden to show by a preponderance of the evidence that the award decision lacked a rational basis or violated law.  *MORI Assocs., Inc.*, 102 Fed. Cl. at 519.

C.   *Waiver Does Not Apply to Plaintiff's Claims Except to the Extent that Plaintiff Challenges DOL's Decision Not to Conduct a Small-Business Set Aside*

Defendant-intervenor contends that plaintiff has waived certain arguments pursuant to *Blue & Gold Fleet, L.P. v. United States*, 492 F.3d 1308 (Fed. Cir. 2007), because plaintiff failed to submit timely challenges to DOL's actions that occurred before October 26, 2011, the date DOL decided to take corrective action and reevaluate the proposals.  Specifically, defendant-intervenor states that plaintiff failed to timely raise its contentions that "(1) the original [RFI] was copied verbatim from Compusearch's website; (2) DOL switched the procurement to a GSA schedule solicitation in order to circumvent small business set aside requirements; and (3) DOL undertook procurement revisions and corrective actions in order to steer the award to Compusearch." Def.-Intervenor's Cross-Mot. for J. on Administrative R. 8 (citations omitted).

According to *Blue & Gold Fleet*, "a party who has the opportunity to object to the terms of a government solicitation containing a patent error and fails to do so prior to the close of the bidding process waives its ability to raise the same objection subsequently in a bid protest action in the Court of Federal Claims." 492 F.3d at 1313.

With regard to the first and third arguments defendant-intervenor contends are waived, the Court finds that these are not properly objections to a patent error in the terms of the solicitation at issue.  In rejecting plaintiff's claims below, the Court rejects these arguments as well.  *See infra* Parts II.I, II.K.

The second argument, to the extent that it is a challenge to the agency's decision not to conduct a small-business set aside, is not properly before this court.  This is an objection to the terms of the solicitation that could have been made pre-award.  Although alluded to in its protests to GAO, plaintiff's small-business set-aside argument was never identified as a specific challenge to the procurement before GAO.  *See* AR Tab 24; AR Tab 51.  Accordingly, to the extent that plaintiff is now seeking to rely upon this argument,[7] it has been waived.  *See Benchmade Knife Co. v. United States*, 79 Fed. Cl. 731, 737–38 (2007) (finding the plaintiff's small-business set-aside argument waived when it did not raise it prior to the close of the solicitation period).

D.    *DOL's Reevaluation of the Proposals Was Proper, and Its Corrective Action Was Reasonable*

Plaintiff argues that DOL's reevaluation of the proposals was improper.  Specifically, plaintiff alleges that the new ratings resulting from DOL's reevaluation were arbitrary and capricious because the same TEP evaluated the same proposal information and issued different ratings, resulting in a larger spread between the technical ratings of plaintiff and defendant-intervenor.  Plaintiff also argues that the corrective action as executed was arbitrary and capricious because it did not comport with DOL's stated plan for its corrective action.

To support its argument that the reevaluation was improper because it involved the same TEP and the same proposals, plaintiff points to *Wackenhut Services, Inc. v. United States*, in which the Court of Federal Claims found that the Source Evaluation Board ("SEB") violated the Administrative Procedure Act "by failing to create a record to explain and justify the . . . increase in point score . . . between the SEB's Preliminary and Final Findings as to [an offeror's] Technical Approach Subfactor."  85 Fed. Cl. 273, 297 (2008).  Because of this failure to create a record, the court could not determine whether the SEB acted arbitrarily or capriciously in its evaluation of the offerors' revised final proposals, which were submitted after the agency conducted discussions.  *Id.*

Here, unlike in *Wackenhut*, the TEP provided adequate documentation to support its analysis and the adjectival ratings it assigned to the quotes.  *See* AR Tab 21; Def.-Intervenor's Reply Br. in Supp. of Def.-Intervenor's Mot. for J. on Administrative R. ("Def.-Intervenor's Reply") app. A (comparing excerpts from the TEP's initial evaluation report and its reevaluation report); *compare* AR Tab 10, *with* AR Tab 21.  Additionally, as defendant highlights, in *Wackenhut*, the solicitation provided for a negotiated procurement with two rounds of evaluation—the first round based on initial proposals and the second, post-discussion round

---

[7] DSI does not set out any of the above allegations as arguments unto themselves.  All of these concepts are discussed or implied in the background section of plaintiff's motion for judgment on the administrative record or throughout its other arguments.

based on final proposals.  Def.'s Reply to Pl.'s Resp. to Cross-Mots. for J. upon Administrative R. ("Def.'s Reply") 5; *see Wackenhut*, 85 Fed. Cl. at 280–81.  Here, one round of evaluations was contemplated by the solicitation after the competitive range was established, AR Tab 1, at 72, and the second round of evaluations—intended to replace the first round—was conducted as a result of DOL's corrective action, *see* AR Tab 85, at 2255.  Accordingly, explanation of the increase in quoter ratings was not necessitated by the solicitation.  Regardless, the detailed analysis the TEP provided in the reevaluation report adequately supported the new adjectival ratings and justified the changes made to the evaluations.[8]  *See* AR Tab 21.

Nothing suggests that it was improper for DOL to employ the same TEP to reevaluate the same quotes.  Despite plaintiff's contentions, the record does not reveal that the members of the TEP were biased or otherwise negatively motivated, and plaintiff posits no persuasive reason why employing the same TEP was unreasonable.  Accordingly, the Court finds meritless plaintiff's argument that the ratings were arbitrary and capricious because DOL employed the same TEP on reevaluation.  *See Comprehensive Health Servs., Inc. v. United States*, 70 Fed. Cl. 700, 710, 726–29 (2006) (finding that a reevaluation was not arbitrary or capricious when it was conducted by the same evaluation board with one new member, involved the same proposals as the first evaluation, and resulted in changed adjectival ratings for the offerors, including at least one downgrade); *YRT Servs. Corp. v. United States*, 28 Fed. Cl. 366, 390–91 (1993) (finding the agency's actions reasonable and that the agency did not merge two distinct evaluation phases when it used "largely the same individuals" from the first phase of evaluations to conduct the second phase of evaluations); *see also 4D Security Solutions, Inc.*, B-400351.2 *et al.*, 2008 WL 5505408, at *1–5 (Comp. Gen. Dec. 8, 2008) (denying a protest from an offeror who was originally awarded the contract and, after corrective action was taken involving reevaluation of quotes by the same evaluator, was not found to present the best value to the Government); *U.S. Def. Sys., Inc.*, B-245563 *et al.*, 1992 WL 328737, at *1–2 (Comp. Gen. Nov. 3, 1992) (involving a reevaluation of proposals by the same two-member TEP that conducted the initial evaluation of proposals).

Plaintiff also argues that DOL's execution of the corrective action was arbitrary and capricious because it did not comport with DOL's stated plan for its corrective action.  Pl.'s MJAR 25–27.  After plaintiff alleged that DOL erred in its initial evaluation by, among other things, adding two evaluation items not specified in the solicitation under subfactor (b) of the technical factor and by failing to evaluate an evaluation item, DOL decided to take corrective action.  AR Tab 85, at 2255.  The proposed corrective action consisted of a reevaluation of the quotes "*without* reference to the Technical Subfactor (b) factors of 'Change Management' and 'Business Process Re-Engineering' and *with* reference to the factor of 'Quality Assurance Surveillance Plan.'"  *Id.*

The corrective action DOL outlined was appropriately conducted.  In the second TEP report, the TEP properly listed and evaluated the ten components that the solicitation provided

---

[8] This holds true for DOL's assessment of the technical factor for defendant-intervenor.  *See* Pl.'s MJAR 40–41 (arguing that the TEP's assessment of defendant-intervenor's technical factor was arbitrary and capricious for the same reasons it alleged that the TEP's assessment of plaintiff's technical factor was arbitrary and capricious).

would be analyzed under subfactor (b) of the technical factor, notably excluding "Change Management and Business Process Re-Engineering" and including "Quality Assurance Surveillance Plan" as the solicitation required.  *See* AR Tab 21, at 409.  However, "Change Management" and "Business Process Re-Engineering" were stated considerations in the solicitation within the "Project Management and SDLCM Implementation Plan and Approach" component of subfactor (b).  AR Tab 1, at 47–48.  Contrary to plaintiff's contentions, the solicitation provided that DOL was to evaluate these considerations as part of an announced factor.  *See Fulcra Worldwide, LLC v. United States*, 97 Fed. Cl. 523, 536 (2011) ("A solicitation must state all significant factors and subfactors that the agency will consider in evaluating proposals.  Evaluators must base their decisions on these factors and subfactors." (citations omitted)).  The TEP thus reevaluated the proposals appropriately when it looked at "Change Management" and "Business Process Re-Engineering" in its review of "Project Management and SDLCM Implementation Plan and Approach."

Plaintiff also contends that DOL acted arbitrarily and capriciously when it "simply moved the same verbiage from its original TEP report regarding 'Change Management' and 'Business Process Re-Engineering' into another evaluation factor—'Project Management'"  Pl.'s MJAR 12, 26.  The Court finds that it was not unreasonable for the TEP, when writing its reevaluation report, to reuse language from its initial evaluation when its initial evaluation of those components did not change upon reevaluation.

Accordingly, the corrective action DOL implemented was rational and supported by the record.  Moreover, as discussed above, DOL's execution of its corrective action was appropriate, reasonable, and within its discretion.

### E.      *DOL's Discussions with Plaintiff Were Proper and in Accordance with FAR*

Plaintiff contends that DOL failed to engage in meaningful discussions regarding the weaknesses in its proposals and its past performance evaluations.  First, it is not disputed that this solicitation was issued under the GSA FSS for Schedule 70, Information Technology.  Accordingly, FAR 8.4 provided the requisite guidelines and procedures for the procurement.  FAR 8.403(a) ("Procedures in this subpart apply to—(1) Individual orders for supplies or services placed against [FSS] contracts; and (2) [blanket purchase agreements] established against [FSS] Contracts.").

Despite the applicability of FAR 8.4, plaintiff contends that DOL failed to conduct meaningful discussions pursuant to FAR 15.306 because, when conducting discussions, "DOL never mentioned any deficiencies in [plaintiff's] Technical Approach, despite its later evaluation of deficiencies in [plaintiff's] Sub-factor (a) and Sub-factor (b) submissions."  Pl.'s MJAR 33.  Additionally, plaintiff contends DOL failed to comply with FAR 15.306 because it did not provide plaintiff with an opportunity to respond to its past performance evaluations.  *Id.* at 34.

Plaintiff's contentions lack merit.  As an initial matter, FAR 8.404 expressly provides that FAR Part 15 "do[es] not apply to . . . orders placed against [FSS] contracts."  FAR 8.404(a).  "FAR Part 15, therefore, is explicitly made inapplicable to FSS contracts."  *Sys. Plus Inc. v. United States*, 68 Fed. Cl. 206, 210 (2005).  Plaintiff contends that because DOL engaged in discussions, it was required to follow FAR Part 15 procedures.  This misconstrues case law.

This court "consistently has held that procurements conducted under Subpart 8.4 are different from those conducted under Part 15, even if 'some procedures also present in Part 15 are utilized.'" *Allied Tech. Grp. v. United States*, 94 Fed. Cl. 16, 44 (2010) (quoting *Sys. Plus Inc.*, 68 Fed. Cl. at 211), *aff'd*, 649 F.3d 1320 (Fed. Cir. 2011). Therefore, that DOL conducted discussions did not mean it had to comply with the strict procedures of FAR Part 15. *Id.* ("Where a solicitation governed by FAR Subpart 8.4 uses procedures found in FAR Part 15, the procurement official need not comply with 'the more formal and rigorous procedures for negotiated procurements.'" (quoting *Holloway & Co. v. United States*, 87 Fed. Cl. 381, 393 (2009))); *Sys. Plus Inc.*, 68 Fed. Cl. at 210 ("[W]hile the agency can elect to use procedures from [FAR Part 15], they are not presumptively applicable."); *Labat-Anderson Inc. v. United States*, 50 Fed. Cl. 99, 104 (2001) ("[T]his Court has held that FSS acquisitions are not transformed into negotiated procurements simply because an agency chooses to utilize in its evaluation process more formal elements typically used in a negotiated procurement . . . .").

Despite this, relevant portions of FAR Part 15 may be used in analyzing a procurement when those specific portions of FAR Part 15 were "implicated by the particular procedure that the solicitations stated would be used." *Sys. Plus Inc.*, 68 Fed. Cl. at 211. Case law suggests that relatively clear intentions that FAR Part 15 procedures will be used is necessary to trigger their application to a procurement. *See id.*; *see, e.g.*, *ACS Gov't Solutions Grp., Inc.*, B-282098 *et al.*, 1999 WL 397426, at *10 (Comp. Gen. June 2, 1999) (analyzing discussions conducted in a FAR Part 8 procurement using FAR Part 15 guidance when the solicitation expressly provided that discussions were part of the procurement process). Here, the solicitation specifically provided that the agency "intend[ed] to evaluate quotes and make award *without discussions*," although it reserved the agency's "right to conduct discussions, if necessary." AR Tab 1, at 72 (emphasis added). Accordingly, the solicitation not only did not contemplate discussions, but also did not condone a FAR Part 15 procedure governing discussions. And, under FAR Part 8, DOL was under no obligation to hold discussions. *See Career Training Concepts, Inc.*, B-311429 *et al.*, 2008 WL 6049972, at *4 (Comp. Gen. June 27, 2008) ("[W]here a procurement is an FSS purchase conducted pursuant to FAR part 8.4, . . . an agency properly may make award without conducting discussions, even if the solicitation does not expressly advise vendors of that possibility." (citing *Avalon Integrated Servs. Corp.*, B-290185, 2002 WL 1577705, at *3 (Comp. Gen. July 1, 2002)). Accordingly, plaintiff's contention that DOL violated FAR by failing to provide meaningful discussions fails.[9]

---

[9] Although FAR Part 15 does not apply, the Court will review DOL's actions to ensure they comply with FAR's requirement of fundamental fairness in the procurement process. *Allied Tech. Grp. Inc.*, 94 Fed. Cl. at 44; *Unisys Corp. v. United States*, 89 Fed. Cl. 126, 140 (2009). This requires that "[a]ll contractors and prospective contractors shall be treated fairly and impartially but need not be treated the same." FAR 1.102-2(c)(3). DOL treated all quoters fairly with respect to discussions. As plaintiff points out, "DOL held Discussions with each of the vendors in the competitive range following product demonstrations." Pl.'s MJAR 33; *see* AR Tab 22, at 457. Nothing in the record implies that these discussions were unequal or that one quoter was provided more information than another.

F.       *DOL Did Not Act Arbitrarily or Capriciously When It Evaluated Plaintiff's Quote With Respect to the Technical Subfactors*

1.       <u>DOL Properly Evaluated Plaintiff's Quote for Subfactor (A)</u>

Plaintiff contends that DOL "improperly downgraded" plaintiff's rating for subfactor (a) of the technical factor, which assessed functionality requirements, because plaintiff "follow[ed] the RFQ." Pl.'s MJAR 28–29. In the solicitation, DOL explained that a quote "shall be evaluated as to what extent it meets each functional requirement" of certain attachments to the RFQ. AR Tab 1, at 69. The solicitation explained: "The quoter *must* provide comment(s) for Attachments 2–4 on how [its] proposed product meets that specific functionality. No comment, commenting as 'N/A', or leaving this field blank WILL count against the overall total score." *Id.* (emphasis added). The penultimate sentence in the explanatory paragraph stated, "It is very important that all quoters make it clear how and when they intend to meet each functional requirement." *Id.*

Amendment six to the solicitation deleted the entire paragraph that explained subfactor (a) and replaced it with a revised paragraph. AR Tab 7, at 90. The revised paragraph stated, in relevant part: "The quoter *shall* provide comment(s) for Attachments 2–4 on how [its] proposed product meets that specific functionality. No comment, commenting as 'N/A', or leaving this field blank WILL count against the overall total score." *Id.* The final sentence read:

> [I]t is very important that all quoters make it clear as to how and when they intend to meet each functional requirement by stating one of the following:
>
> > (a) included in the core software package
> > (b) included through customization at no additional cost to the government
> > (c) included through customization at additional cost to the government
> > (d) included by another means (identify means)
> > (e) not included/offered.

*Id.* When responding, plaintiff used only the template responses and did not provide any comments or other detail as to how its quote complied with subfactor (a)'s functionality requirements. *See* AR Tab 21, at 406. Despite not providing comments, plaintiff was rated "good/marginal" for this subfactor. *Id.*

Plaintiff now claims that it was "downgraded" for complying with the terms of the solicitation, namely for replying to the functionality subfactor with the template responses. The Court is not persuaded. First, plaintiff was not deemed unsatisfactory and, despite not providing comments, was still assigned a relatively favorable rating—"good/marginal." Second, amendment six explicitly stated that quoters "shall provide comment(s) . . . on *how* their proposed product meets that specific functionality." AR Tab 7, at 90 (emphasis added). Third, the amendment does not state that the template responses are themselves "comments" nor that they can be provided in lieu of comments. The TEP evaluation report explains that the TEP "looked to the template responses . . . to determine whether offerors met the requirements, and [it] looked to the comments to support the vendors' template responses." AR Tab 21, at 406. Notably, the TEP did not evaluate the comments themselves, which is in accordance with DOL's

answer to a question posed by a quoter.  AR Tab 2, at 77.  The Court finds the TEP's evaluative method consistent with the explanation contained in the solicitation and, therefore, not arbitrary or capricious.

In addition, the TEP's evaluation report expressed concern with plaintiff's template responses to some of the functionality requirements because the specific response did not always properly correspond to the functionality requirement being assessed.  For example, the TEP explained that plaintiff responded "[i]ncluded in the core software package" for an item that was not a core functionality requirement.  AR Tab 21, at 406.  The TEP, therefore, could not discern how plaintiff would meet this requirement.  *See id.*  This lack of clarity, presumably resulting from a lack of detailed comments, reasonably caused the TEP to lack confidence in plaintiff's proposal, thus resulting in plaintiff's "good/marginal" rating.  It therefore appears that it was plaintiff's inadequate responses to the functionality requirements, not its failure to provide comments, that resulted in its rating.

Accordingly, the agency's evaluation of plaintiff's response to subfactor (a) was reasonable and within its discretion.  *See Benchmade Knife Co.*, 79 Fed. Cl. at 735 ("Agency technical evaluations . . . should be afforded a greater deference by the reviewing court.").

> 2.  DOL Did Not Act Arbitrarily or Capriciously When It Evaluated Plaintiff's Quote for Subfactor (B)
>
> > a.  DOL's Evaluation of Plaintiff's Work Breakdown Structure Was Not Arbitrary or Capricious

Plaintiff also takes issue with the weakness it was assigned as a result of its Work Breakdown Structure ("WBS"), which was assessed within the "Project Management and SDLCM Implementation Plan and Approach" component of subfactor (b) of the technical factor.  According to the solicitation: "The WBS is the project roadmap; as such, it shall be used throughout the life cycle of the project.  The WBS shall document the activities, milestones, resource and duration anticipated to complete each phase of the specific request/requirement."  AR Tab 1, at 46.  Notably, DOL expected that quoters would provide a proposed WBS with their quotes.  *See* AR Tab 1, at 68.

Plaintiff rests its challenge on question and answer number 56.  *See* Pl.'s MJAR 30.  Question 56 posited: "Does the DOL require Quoters to provide an updated WBS with the quotation?  If so, can the basic WBS provided be modified at all levels or are we supposed to only add subtasks to the high-level tasks?"  AR Tab 2, at 79.  DOL's answer stated, "DOL does not require the offerors to provide an updated WBS with their quotes."  *Id.*

Upon evaluation, the TEP determined that "DSI did not provide a comprehensive WBS." AR Tab 21, at 433.  The TEP explained that there were gaps in plaintiff's WBS and noted that the "lack of detailed WBS means there is poor up-front definition and planning, which will cause serious problems for DOL in many areas later in the project lifecycle."  *Id.*  The TEP noted that "there is a moderate risk to DOL that DSI will NOT satisfy this requirement."  *Id.*  Accordingly, this was determined to be a weakness of plaintiff's within the "Project Management" component of subfactor (b) of the technical factor.  *Id.*

The term "updated" in the answer to question 56 seems to refer to the WBS model contained in attachment 5 of the solicitation, *see* AR Tab 98, at 2545–46, which was also referenced by the initial July 2010 solicitation, AR Tab 34, at 652.  Defendant-intervenor contends that "there would be no purpose to having offerors supply a WBS with their proposal if they could simply copy the identical WBS from the solicitation."  Def.-Intervenor's Reply 7.  The Court agrees.  Moreover, when compared to the solicitation's WBS, AR Tab 98, at 2545–46, plaintiff did, in fact, supply additional detail to its WBS submitted with its quote, indicating that it understood that mirroring the solicitation's WBS was not contemplated by the agency.  *See* AR Tab 70, 2053–55.  Given this, and after review of the record, the Court determines that DOL did not act arbitrarily or capriciously when it assessed a weakness for plaintiff's WBS.

Even if the Court were to find that it was improper for DOL to assess plaintiff a weakness for its WBS, this was only one of six non-material weaknesses plaintiff received for this component, which ultimately received a "good technical rating and moderate risk rating."[10]  AR Tab 21, at 431.  Had the TEP not assessed plaintiff's WBS as a weakness, it is unlikely that either the component's rating or the overall rating for subfactor (b) would have increased.[11]  Taking WBS out of the evaluation scheme, plaintiff would have received three strengths and five weaknesses; if WBS were included as a strength, plaintiff would have received four strengths and five weaknesses.  It is unlikely that this would have altered the "good/moderate" rating that plaintiff received for this component.  In fact, the "DOL System Interface Requirements" component, which had two strengths and two non-material weaknesses, also received "a Good technical rating and Moderate risk rating."  AR Tab 21, at 428.  Therefore, even if plaintiff's WBS were not considered, or were considered a strength, the ratio of strengths to weaknesses likely would not alter the overall adjectival rating.

> b.  DOL Properly Concluded that Plaintiff Did Not Adequately Address Risk in Subfactor (B)

Plaintiff also takes issue with another weakness it was assessed under the "Project Management" component of subfactor (b).  Plaintiff argues that the TEP's assessment that plaintiff "did not address 'how [it] will manage, track and communicate project risks,'" Pl.'s MJAR 30 (quoting AR Tab 21, at 433), was improper because "[r]isk management is not one of the evaluation components listed in the RFQ," *id.* at 31.  Plaintiff explains that, in the Project Management description, "the only mention of risk is 'risk monitoring.'"  *Id.* (quoting AR Tab 1, at 43).  It notes that the concluding paragraph of the pertinent section of the solicitation states that the specific phase of the contract at issue "includes assisting the [Project Management Office ("PMO")] to setup the project infrastructure and reporting required to manage the project— charter, change management plan, templates, communications and *risk management plans*."  *Id.* (quoting AR Tab 1, at 47).  Plaintiff argues that "there was no requirement to provide a risk

---

[10] This component had three identifiable strengths.  AR Tab 21, at 433.

[11] This component is one of ten evaluative components that comprise subfactor (b) of the technical subfactor.  Accordingly, the overall impact of the TEP's assessment of plaintiff's WBS is slight.

management plan and, in fact, that responsibility, post-contract award[,] was only to assist the PMO with such a plan." *Id.*

The Court does not find plaintiff's argument persuasive. Although the solicitation did not provide for a specific "risk management" evaluative factor, it is not the case, as plaintiff implies, that plaintiff was faulted for not providing a risk management plan. Instead, in its review of plaintiff's project management proposal, the TEP explained: "DSI did not address how [it] will manage, track and communicate project risks (as all projects have risks). This demonstrates that the vendor does not understand how to manage risks for a project of this size and complexity." AR Tab 21, at 433. The TEP did not fault plaintiff for not providing a specific risk management proposal, but rather, under the Project Management component of subfactor (b), the TEP observed that plaintiff did not demonstrate how it would deal with project risks. *See* AR Tab 1, at 43, 72. The Court finds that it was reasonable for the agency to expect a certain level of competence and understanding demonstrated in the Project Management proposals. It was not an abuse of discretion for the agency to assess the quoter's attention to risk, or lack thereof, in its Project Management proposal.[12]

Moreover, even if this were not considered a "weakness," plaintiff's overall adjectival rating for this component would not likely change. *See supra* Part II.F.2.a (concerning plaintiff's adjectival ratings for its WBS). Accordingly, DOL properly concluded that plaintiff did not adequately address risk in subfactor (b).

G.     *DOL Properly Evaluated Plaintiff's Quote With Respect to the Past Performance and Product Demonstration Factors*

1.     DOL Reasonably Evaluated Plaintiff's Past Performance

The solicitation required quoters to provide past performance references. AR Tab 1, at 70; *see* AR Tab 22, at 466. DOL sent Past Performance Questionnaires ("PPQs") to each of the quoter's respective references. AR Tab 22, at 466. DOL received four responses for plaintiff: one from the [***], one from the [***], and two from [***]. AR Tab 105. [***]'s questionnaires both rated plaintiff as "satisfactory" overall, the [***] rated plaintiff as "very good" overall, and [***] rated plaintiff as "unsatisfactory."[13] *Id.*; *see also* AR Tab 22, at 466. As a result of these ratings, plaintiff was given an overall past performance rating of "satisfactory." AR Tab 22, at 466.

---

[12] Moreover, the TEP included this analysis concerning risk in its discussion of a table plaintiff provided in its quote "that relate[d] the AMS requirements by solicitation section to the implementation deliverables." AR Tab 21, at 432. That risk was not its own distinct discussion supports the conclusion that the agency did not improperly consider it a separate component or subfactor.

[13] Note that there was no "good" rating available. The adjectival scale responders were instructed to utilize was, in ascending order, unsatisfactory, marginal, satisfactory, very good, and exceptional. *See* AR Tab 105, at 2884.

Plaintiff argues several points with regard to DOL's past performance evaluation.  First, plaintiff argues that [***] effectively controlled the outcome of plaintiff's past performance rating by providing two questionnaire responses on the same contract, both of which provided overall ratings of satisfactory.  Second, plaintiff argues that it should not have received ratings of satisfactory from [***] because it had not been told that it performed inadequately during the course of the contract.  Third, plaintiff argues that [***] questionnaire was flawed because it reviewed a period of time for which plaintiff was a subcontractor and issues with the prime contractor prevented it from performing adequately.  Plaintiff contends that DOL should have provided it with an opportunity to explain its unsatisfactory rating from [***].

The Court finds that plaintiff's arguments lack merit.  First, [***]'s two questionnaires did not control the outcome of the evaluation.  Both questionnaires rated plaintiff "satisfactory." If one had been eliminated, plaintiff would have had one "satisfactory," one "very good," and one "unsatisfactory" past performance rating.  It is unlikely that this would result in an adjectival rating higher than "satisfactory," namely "very good" or "exceptional."

Further, the solicitation explicitly reserved for DOL the ability to obtain past performance information beyond the information provided by the quoters' references.  AR Tab 1, at 70 ("The DOL may check other sources of past performance information.").  Accordingly, it was not improper for DOL to seek out additional information about the past performance of each offeror. Moreover, the past performance evaluation document provides DOL's reasoning for requesting a second [***] questionnaire for plaintiff.  The document explained that "[a]n additional reference, with firsthand knowledge of the procurement and implementation of [***], was also given PPQs to complete."  AR Tab 11, at 146.  Therefore, it is reasonable to conclude that [***] PPQs concerning plaintiff's past performance.  The agency's action was certainly reasonable and explicitly contemplated by the solicitation.[14]

Plaintiff also argues that it should not have received "satisfactory" ratings from [***] because [***] never provided any negative feedback or criticism during the course of the contract.  Plaintiff overlooks the fact that satisfactory is third on a scale of five ratings and indicates that "[p]erformance meets contractual requirements" and that there were "some minor problems for which corrective actions taken by the contractor appear or were satisfactory."  AR Tab 105, at 2884.  This is not a negative rating; in fact, this rating reflects a generally acceptable performance.[15]  Additionally, plaintiff appears to simply disagree with the rating provided, which is not enough to demonstrate arbitrary or capricious conduct on behalf of DOL.  *Bannum, Inc. v. United States*, 91 Fed. Cl. 160, 173 (2009) ("[The plaintiff's] mere disagreement with the [agency's] incumbent contract rating is not sufficient for this Court to overturn it.").  The solicitation provided that the CO was entitled to consider past performance ratings in her

---

[14] In addition to this record evidence, defendant explains that two questionnaires were submitted because "[***] had only been in her position for a short time when the questionnaires were distributed, so [***] also sought feedback from her predecessor [***], who was no longer employed by [***]."  Def.'s Reply 13 (citing AR Tab 105, at 2883–94); *see also* Hr'g Tr. at 12.

[15] DOL indicates that the only ratings that were considered unfavorable were "unacceptable" and "marginal."  AR Tab 22, at 470.

assessment of the quotes.  AR Tab 1, at 70–72.  The Court finds that the CO did not abuse her discretion and acted reasonably in her consideration of the past performance factor.

Finally, plaintiff takes issue with the fact that it could not provide an explanation to DOL of the negative rating [***] assigned it.  First, as previously discussed, this is not a FAR Part 15 procurement; therefore FAR 15.306's directive to discuss adverse past performance information does not apply.  Second, DOL did not conduct past performance discussions with any offerors, *see* AR Tab 22, at 470, therefore treating all offerors fairly in accordance with FAR 1.102-2, *see infra* Part II.K.  Moreover, discussions were explicitly not contemplated by the solicitation, AR Tab 1, at 68, and the solicitation was clear that past performance questionnaires would be used as an evaluative factor, AR Tab 1, at 70.  Third, DOL noted that each offeror received one "less-than-favorable" reference, either marginal or unacceptable, and determined that "no explanation would have changed the overall result of the Past Performance evaluation."  AR Tab 22, at 470.  The CO explained that "[a]t best, if any offeror had submitted an explanation to rebut its rating, DOL might have concluded that the Past Performance on that particular project should not be viewed unfavorably.  In all cases, it would not have caused DOL to upgrade the offerors' overall Past Performance ratings."  AR Tab 22, at 470–71.  Given the ratings the offerors received, specifically defendant-intervenor and plaintiff, this is a reasonable assessment.  Therefore, discussions regarding past performance evaluations were not required by law and were not contemplated by the solicitation.  And, in any event, discussions would not have altered the overall past performance ratings for any offeror.  Accordingly, the agency acted reasonably and within its discretion, and not arbitrarily, capriciously, or contrary to law, when it evaluated past performance according to the terms of the RFQ.  *See Bannum, Inc.*, 91 Fed. Cl. at 173 ("An agency does not act unreasonably when it sets forth specific past performance evaluation criteria and then applies those criteria.").

## 2.   DOL Reasonably Evaluated Plaintiff's Product Demonstration

Next, plaintiff argues that DOL misevaluated its product demonstration.  Plaintiff bases this argument on the fact that (1) the chair of the TEP did not attend its product demonstration, but attended the demonstrations of the other offerors, and (2) the users at the product demonstration questioned whether plaintiff's system was Section 508 compliant.

Neither of these arguments has merit.  First, the solicitation did not state that the members of the TEP had to attend the product demonstrations.  *See* AR Tab 1, at 71.  The solicitation instead stated that "[u]p to five (5) DOL staff members will attend each of the [product demonstration] sessions and evaluate the product's User Interface, Reports, Wizards/Help Tips, etc."  *Id.*  Accordingly, there was no requirement or expectation that the TEP chair attend the product demonstrations.

Second, plaintiff argues that its Section 508 compliance, *see supra* note 6, was questioned as a result of the product demonstration and that this is erroneous because it had never before been cited as being Section 508 noncompliant during the incumbent contract.  Plaintiff neglects to realize that the comments about Section 508 compliance appear *only* in the "Summary of Product Demonstrations," which noted that "[t]he users [at the product demonstration] questioned whether the system is Section 508 compliant."  AR Tab 9, at 93–94.  This document contains a mere recital of the observations of users present at the product demonstration as

summarized by Ms. Tova Stein, Hr'g Tr. at 17–18, an advisory member of the TEP, *see* AR Tab 21, at 404–05.  Section 508 compliance did not factor into the CO's discussion or determination regarding product demonstration.  *See* AR Tab 22; *see also* Hr'g Tr. at 16–17, 35.  The record reflects that this was simply the agency's thorough recordation of the comments it received as a result of the product demonstration.  Accordingly, DOL did not act arbitrarily, capriciously, or contrary to law, nor did it abuse its discretion, with regard to how it conducted and assessed the product demonstration factor.

> H.     *DOL Properly Conducted a Price Reasonableness Analysis*

Plaintiff argues that DOL failed to conduct a proper price reasonableness analysis.  In support of its contention, plaintiff states that the agency's analysis was erroneous because it "judged all prices reasonable simply because they were below the IGCE."  Pl.'s MJAR 42.  Additionally, plaintiff takes issue with DOL's determination that the price disparity among the offerors, particularly between plaintiff and defendant-intervenor, was due to the types of solutions being proposed—specifically a new-to-the-market product from defendant-intervenor and an upgrade to DOL's existing product from plaintiff.  *Id.* at 42–43.  Relatedly, plaintiff asserts that the spread in prices between plaintiff and defendant-intervenor "should have raised red flags with DOL as to price reasonableness."  *Id.* at 43.  Finally, plaintiff argues that the rationale presented by the CO in the award decision document is *post hoc* because, despite referencing the same price proposals, it is more extensive than her initial analysis.  *Id.* at 42–43.

The Court does not find any of plaintiff's arguments persuasive.  First, FAR 8.404, which governs this procurement, states:

> Supplies offered on the schedule are listed at fixed prices.  Services offered on the schedule are priced either at hourly rates, or at a fixed price for performance of a specific task . . . .  GSA has already determined the prices of supplies and fixed-price services, and rates for services offered at hourly rates, under schedule contracts to be fair and reasonable.  *Therefore, ordering activities are not required to make a separate determination of fair and reasonable pricing, except for a price evaluation as required by 8.405-2(d).*  By placing an order against a schedule contract using the procedures in 8.405, the ordering activity has concluded that the order represents the best value.[16]

FAR 8.404(d) (emphasis added).  In turn, FAR 8.405-2(d) states that "[t]he ordering activity is responsible for considering the level of effort and the mix of labor proposed to perform a specific task being ordered, and for determining that the total price is *reasonable*."  FAR 8.405-2(d) (emphasis added).  That reasonableness determination must be documented.  FAR 8.405-2(f) ("The Ordering Activity shall document . . . [t]he price reasonableness determination required by paragraph (d) of this subsection.").

---

[16] "'Ordering activity' means an activity that is authorized to place orders, or establish blanket purchase agreements (BPA), against the General Services Administration's (GSA) Multiple Award Schedule contracts."  FAR 8.401.

"Price reasonableness generally addresses whether a price is too high . . . ." *First Enter. v. United States*, 61 Fed. Cl. 109, 123 (2004); *accord Tech Sys. Inc. v. United States*, 98 Fed. Cl. 228, 264 (2011); *see also Afghan Am. Army Servs. Corp. v. United States*, 90 Fed. Cl. 341, 356 (2009) ("[T]he purpose of price reasonableness analysis is to ensure that the offeror's price is not unreasonably high or unreasonably low." (quoting *Erinys Iraq Ltd. v. United States*, 78 Fed. Cl. 518, 531 (2007)) (internal quotation marks omitted)). This is distinct from price realism, which seeks to "ensure that an offeror understands the solicitation requirements and actually can perform those requirements." *Erinys Iraq Ltd.*, 78 Fed. Cl. at 531. Here, the parties do not dispute that a price reasonableness analysis was required.

One way to determine price reasonableness is to compare the quoters' price proposals to the IGCE. *See* FAR 15.404-1(b)(2)(v);[17] *see Tech Sys. Inc.*, 98 Fed. Cl. at 264; *Holloway & Co.*, 87 Fed. Cl. at 395 (involving an FSS procurement). Here, that is precisely what the CO did, noting that all price proposals fell below the IGCE of [***]. AR Tab 22, at 467–68. As discussed *infra*, the IGCE itself was reasonable. *See infra* Part II.I. Accordingly, the CO was within her discretion when she determined that the price proposals were reasonable based on their comparison to the IGCE. The court also finds that the documentation of this assessment, *see* AR Tab 22, at 471–72, is adequate.

Additionally, the CO discussed the reason for the price discrepancy between plaintiff and defendant-intervenor, noting the differences in their proposed products, AR Tab 22, at 468, 471–72, and the overall desirability of purchasing defendant-intervenor's technically superior, more efficient solution, AR Tab 22, at 472–74 (discussing the price/technical tradeoff analysis). The Court finds the agency's rationale regarding the discrepancy among the offerors' price proposals to be reasonable.

Finally, plaintiff's argument that DOL's analysis represents a *post-hoc* rationale for its price reasonableness determination is unfounded. First, that the evaluation of price proposals in the second award selection document is slightly longer and more detailed than the evaluation of price proposals in the initial award selection document does not suggest that the agency engaged in conduct that was arbitrary, capricious, not in accordance with law, or otherwise unreasonable. In fact, the second evaluation and source selection document was in response to a protest plaintiff mounted which alleged, among other things, that DOL did not engage in a proper price reasonableness analysis. AR Tab 83, at 2190–93. Plaintiff's protest also challenged the agency's best value determination, stating that a tradeoff analysis weighing technical and price factors was not conducted. AR Tab 83, at 2193.

In response to this protest, the agency reevaluated the proposals and drafted a new award decision document. That it included additional detail and analysis regarding the price reasonableness determination is entirely reasonable, especially in light of the allegations in plaintiff's protest. It appears that, at most, the agency was responding to perceived flaws that plaintiff identified. This cannot now be faulted, especially because the Court finds DOL's price reasonableness rationale and its documentation to be reasonable and adequate.

---

[17] Although FAR Part 15 does not govern this case, the Court may look to it for definitions and guidance when necessary. *See Allied Tech. Grp., Inc.*, 94 Fed. Cl. at 44; *see also supra* Part II.E.

I.        *The IGCE Was Not Irrationally High*

Related to its price reasonableness argument is plaintiff's contention that the IGCE was irrationally high.  The IGCE was [***], which is more than [***] higher than the highest-priced quote DOL received.  Plaintiff states that this in itself suggests that the IGCE was unreasonable.  Additionally, plaintiff contends that the research supporting the IGCE is skewed.  Plaintiff argues that the RFI was "based almost verbatim on specifications for a Compusearch product."  Pl.'s MJAR 44.  Thus, plaintiff alleges that the "IGCE appears to be geared toward accommodating an award to Compusearch."  *Id.* at 45.  Additionally, plaintiff challenges the methodology behind the IGCE by stating that DOL simply took "the highest-priced offering on the market and insert[ed] that amount as the IGCE."  *Id.*  This, plaintiff maintains, was unreasonable.

"Generally, independent government estimates 'represent the agency's best estimate of the most reasonable current price of the products or services being procured.'"  *Process Control Techs. v. United States*, 53 Fed. Cl. 71, 77 (2002) (quoting John Cibinic, Jr. & Ralph C. Nash, Jr., Formation of Government Contracts 1317 (3d ed. 1998)).  "While the court accepts that an IG[C]E need not be supported with exhaustive details, the agency must be able to demonstrate the basis for the estimate, where as here, the analysis is questioned."  *Nutech Laundry & Textile, Inc. v. United States*, 56 Fed. Cl. 588, 594 (2003).

In this case, the record adequately supports DOL's IGCE, and DOL has satisfactorily demonstrated the basis for its estimate.  In DOL's acquisition plan, issued June 25, 2010, the agency stated that "[t]he total estimated lifecycle cost is a maximum of [***] (if vendor hosted)."  AR Tab 18, at 389.  This estimate was "based on a comparison of labor categories, cost estimates received from the market research conducted in January 2010, and the requirements established in the current contract plus an appropriate price escalation."  *Id.*

Regarding the market research conducted, DOL issued an RFI, which included 419 questions prospective vendors were to answer.  AR Tab 25; *see* AR Tab 90, at 2296.  These questions were "based on the identified and documented requirements of the procurement community in DOL."  AR Tab 90, at 2296.  Additionally, the RFI asked vendors to "provide a Rough Order of Magnitude (ROM) cost estimate for" several service models.  AR Tab 25, at 538.  Two of the three identified alternative solutions provided ROMs totaling [***], *see* AR Tab 90, at 2310, and [***], *see* AR Tab 90, at 2309.  The third alternative solution was plaintiff's, and it was singled out for its low price of [***].  AR Tab 90, at 2306.

Accordingly, the IGCE was relatively close to two of the three potential solutions identified after market research was completed.  That these two solutions were proposed by large businesses does not necessarily reveal any partiality toward large businesses.  This is especially true considering plaintiff's was one of the identified alternative solutions.

Additionally, the record reflects an adequate documentation of the IGCE's calculation.  A spreadsheet containing figures computed in part using information from DOL's market research and the cost of the then-current contract demonstrates that the estimated cost for the base period

of a vendor-hosted service,[18] was [***].  AR Tab 19, at 395.  The estimated cost for each option year for vendor-hosted services was [***].  AR Tab 19, at 396.  Taken together, the cost of each of the four option years plus the base year totals [***].  *See* AR Tab 18, at 388.  Nothing in the record indicates that these calculations were arbitrary, capricious, or otherwise unreasonable.

Plaintiff also argues that "DOL's IT Dashboard reflects a total projected cost of only $12.5 million for the AMS."  Pl.'s MJAR 44.  Plaintiff argues that it was surprised that the IGCE was so high in part because the IT Dashboard did not "indicate that magnitude of expenditure." Hr'g Tr. at 8–9.

This argument is unavailing. The parties explain that the IT Dashboard is a system through which the agency publishes budgeting information for certain projects.[19]  Hr'g Tr. at 8–9, 25–26.  In this case, the IT Dashboard states that the total planned cost of DOL's AMS procurement was $12.5 million over the course of a two-year period, AR Tab 66, at 1762, not the five-year period that the initial solicitation contemplated, AR Tab 34, at 628.  Further, no evidence suggests that the IT Dashboard provided a figure that DOL was obligated to employ in its procurement process.  Accordingly, it cannot be properly used to assess the reasonableness of DOL's IGCE.

In conclusion, the Court finds that the IGCE was reasonable and that the agency has adequately demonstrated the basis for its estimate.

---

[18] Vendor hosted means that "[t]he hardware will be housed and hosted at the Contractor's chosen data center facility" and that "infrastructure services . . . will be provided by the Contractor and/or the contractor's chosen hosting facility."  AR Tab 1, at 14.

[19]          The IT Dashboard is a website enabling federal agencies, industry, the general public and other stakeholders to view details of federal information technology investments.

The purpose of the Dashboard is to provide information on the effectiveness of government IT programs and to support decisions regarding the investment and management of resources.  The Dashboard is now being used by the Administration and Congress to make budget and policy decisions.

Federal IT Dashboard, http://www.itdashboard.gov/ (last visited July 27, 2012); *see* 74 Fed. Reg. 66661-01, 66662 (Dec. 16, 2009) ("[T]he IT dashboard Web site, which is a part of USAspending.gov, provides details of Federal Information Technology (IT) investments and is based on data received from agency reports to the Office of Management and Budget (OMB).").

J.      *DOL's Tradeoff Analysis Was Reasonable and Adequately Documented*

Plaintiff next takes issue with DOL's tradeoff analysis.  First plaintiff alleges that the errors made throughout the solicitation process, such as conducting the reevaluation with the same TEP and assessing plaintiff's understanding of risk under technical subfactor (b), "obviously infected" the tradeoff analysis.  Pl.'s MJAR 46–48.  Each "error" plaintiff cites, however, has been addressed by the Court and has been found to be a reasonable action taken by DOL within its sound discretion.  Therefore, plaintiff's argument on this ground fails.

Plaintiff next argues that the tradeoff analysis fails to justify the price premium the agency chose to pay for defendant-intervenor's product.  Pursuant to FAR 8.405-2(f), the contracting officer must document "[t]he rationale for any tradeoffs in making the selection."  FAR 8.405-2(f)(5).  "The amount of documentation necessary in FAR Subpart 8.4 procurements does not rise to the level required by FAR Part 15."  *Matt Martin Real Estate Mgmt. LLC v. United States*, 96 Fed. Cl. 106, 116 (2010); *accord Allied Tech. Grp. Inc.*, 94 Fed. Cl. at 50; *see supra* Part II.E.  Accordingly, the high standards for a proper tradeoff analysis under FAR Part 15 discussed by plaintiff in its motion for judgment on the administrative record do not apply.  *See* Pl.'s MJAR 49–50.

Even though a lower threshold applies for a FAR Part 8 tradeoff analysis, the Court will analyze the CO's tradeoff decision to determine whether it is reasonable and within the agency's discretion.  *See Allied Tech. Grp. Inc.*, 94 Fed. Cl. at 50 (finding, in the context of a FAR Part 8 procurement, that a "CO's best value determination . . . was coherent and a reasonable exercise of his discretion").

Here, DOL engaged in a lengthy tradeoff analysis, detailing the reasons defendant-intervenor presented the best overall value to the Government.  *See* AR Tab 22, at 472–74.  The CO and contracting specialist fully explored the benefits of defendant-intervenor's product relative to the benefits of plaintiff's product.  Additionally, the CO put a premium on efficiency, explaining that plaintiff's "proposed system, which users find difficult to interface with, and which is not intuitive or user-friendly, does not serve DOL's needs."  AR Tab 22, at 474.  This was properly within her discretion and certainly reasonable given the nature of the solicitation and the product being procured.

Plaintiff also contends that the CO incorrectly applied the RFQ award criteria to her best-value analysis by stating that "non-price elements combined are *significantly* more important than price."  Pl.'s MJAR 51–52 (quoting AR Tab 22, at 472) (internal quotation marks omitted).  The RFQ provided that "Technical Approach is significantly more important than Past Performance and when combined, these two factors are more important than Price."  AR Tab 1, at 72.  The RFQ further explained that the "product demonstration is equal in importance to Past Performance."  *Id.*  Plaintiff contends that the CO's statement that non-price elements are *significantly* more important than price misconstrues the RFQ.

In the Court's opinion, the CO was not using "significant" as a term of art and included it in the analysis merely to explain that price was outweighed by the non-price factors.  This is in accordance with the solicitation.  Her tradeoff analysis does not suggest that she unreasonably assessed the weight of price relative to non-price factors; indeed, had she not included the term

significant in her tradeoff analysis, it does not appear that the analysis itself would have changed. The tradeoff properly accounts for defendant-intervenor's higher ratings and technical superiority.  The analysis evidences adherence to the terms of the solicitation and is not only reasonable, but well within the CO's discretion.  Accordingly, the Court finds that DOL conducted and adequately documented a reasonable tradeoff analysis.

### K.    DOL Did Not Breach the Duty to Treat Bids Fairly and Honestly

Plaintiff argues that DOL breached the duty to treat bids fairly and honestly and violated various FAR provisions during the course of the procurement.  Pl.'s MJAR 55–60.  Specifically, plaintiff points to FAR 1.602-2, which tasks contracting officers with the responsibility of "ensur[ing] that contractors receive impartial, fair, and equitable treatment"; FAR 1.102-2, which states that "[a]ll contractors and prospective contractors shall be treated fairly and impartially but need not be treated the same"; and FAR 3.101-1, which provides that "[g]overnment business shall be conducted . . . with complete impartiality and with preferential treatment for none."

In support of its argument, plaintiff reiterates many of the grievances it has already alleged, which effectively amount to a contention that throughout the procurement DOL was attempting to direct an award to defendant-intervenor.  *See* Pl.'s MJAR 55–60.  It contends that "DOL's persistent pattern of conduct demonstrates bias and the absence of a reasonable basis for its decision to award a contract to Compusearch."  *Id.* at 58.

Here, as discussed, the Court finds that DOL did not act arbitrarily, capriciously, or contrary to law, nor did it abuse its discretion, in the course of the procurement process.  Accordingly, DOL did not breach the duty to treat bids fairly and honestly.  *See FAS Support Servs., LLC v. United States*, 93 Fed. Cl. 687, 694 (2010) ("For recovery under the implied contract for bids to be fairly and honestly considered, a plaintiff has to establish arbitrary and capricious action, or an abuse of discretion by the government." (citing *Keco Indus., Inc. v. United States*, 492 F.2d 1200 (Ct. Cl. 1974))); *L-3 Commc'ns Integrated Sys., L.P. v. United States*, 94 Fed. Cl. 394, 397 (2010).  Furthermore, the Court finds that DOL conducted the procurement in accordance with FAR; nothing suggests that the quoters were treated unfairly or unequally.

With regard to plaintiff's allegations of bad faith and bias, plaintiff has not presented facts sufficient to overcome the presumption of good faith afforded the agency.  *Galen Med. Assocs., Inc.*, 369 F.3d at 1330 (noting that the Government is presumed to act in good faith); *see also Avtel Servs., Inc. v. United States*, 70 Fed. Cl. 173, 210 (2006) (collecting cases regarding the presumption of good faith).  To rebut this presumption, a protestor must provide "almost irrefragable," "clear and convincing" proof of bad faith.  *Galen Med. Assocs., Inc.*, 369 F.3d at 1330.  "In the cases where the court has considered allegations of [governmental] bad faith, the necessary 'irrefragable proof' has been equated with evidence of some specific intent to injure the plaintiff."  *Id.* (quoting *Torncello v. United States*, 681 F.2d 756, 770 (Ct. Cl. 1982)) (internal quotation marks omitted); *accord Savantage Fin. Servs., Inc. v. United States*, 595 F.3d 1282, 1288 (Fed. Cir. 2010).  Here, plaintiff has presented no such evidence of specific intent to injure

nor any other record evidence sufficient to raise an inference of bad faith or bias on the part of DOL.[20]

## CONCLUSION

In view of the foregoing, the Court **GRANTS** defendant's and defendant-intervenor's motions for judgment on the administrative record and **DENIES** plaintiff's motion for judgment on the administrative record.  Additionally, plaintiff's motion to stay contract performance pending the court's final ruling (docket entry 56, July 12, 2012) is **DENIED** as moot.  The Clerk shall enter judgment accordingly.

Some information contained herein may be considered protected information subject to the protective order entered in this action on May 4, 2012 (docket entry 17).  This Opinion and Order shall therefore be filed under seal.  The parties shall review the Opinion and Order to determine whether, in their view, any information should be redacted in accordance with the terms of the protective order prior to publication.  The Court **ORDERS** that the parties shall file, by **Thursday, August 9, 2012**, a joint status report identifying the information, if any, they contend should be redacted, together with an explanation of the basis for each proposed redaction.


**IT IS SO ORDERED.**


 s/ George W. Miller
GEORGE W. MILLER
Judge

---

[20] Notably, to the extent plaintiff contends that DOL's prior evaluations of plaintiff's performance on the incumbent contract demonstrate bias, this court has before found that "[c]riticism of [a p]laintiff's performance on the incumbent contract in areas required to be evaluated or erroneous evaluations or inconsistent scoring do not rise to the level of motivation for bias."  *Four Points by Sheraton v. United States*, 63 Fed. Cl. 341, 344 (2005).